THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

S. L.-M., by and through his Parent and
Natural Guardian, LISA LIEDTKE,

                    Plaintiffs,

          v.

DIERINGER SCHOOL DISTRICT NO. 343,

                    Defendant.

NO. C07-5257 RBL

ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter is before the Court on Defendant Dieringer School District's motion for summary judgment. The Court has reviewed the entirety of the record herein and heard oral argument on the matter. For the reasons set forth below, the Court DENIES the motion.

## II. BACKGROUND

Plaintiff Lisa Liedtke brings this action on behalf of her son SLM, a minor who attended eighth grade at North Tapps Middle School during the 2004-2005 school year. Defendant Dieringer School District No. 343 operates North Tapps Middle School, which is located in Pierce County, Washington.

SLM was born with a congenital defect called hypospadias, in which the urinary meatus (or opening of the urethra) is abnormally placed on the shaft of the penis instead of the tip. [Dkt. #27-2, p. 1] Starting in the third grade, this condition, along with some associated urinary tract infections, surgeries, and other complications, began causing SLM to miss significant amounts of school. [Dkt. #27-3, p. 2]

In 2003, SLM enrolled in Sumner Junior High, where he attended seventh grade. [Id.] SLM was

struggling with both self esteem and grades during this time, and he was failing math by the end of the year. [Id., p. 3] Concerned about math, Ms. Liedtke asked that SLM be tested to see if he qualified for special education services. [Id., p. 3] Sumner evaluated SLM and concluded that he was "an intelligent young man" who did not qualify for special education services. [Dkt. #13-2, p. 16] Nevertheless, Sumner prepared a Section 504 Plan (the "Plan") for SLM. [Id., p. 23] As the basis for SLM's disability, the Plan stated only that SLM was having "some medical issues that may, or may not, be involved/related to his difficulties in school."[1] [Id.] The Plan's accommodations were as follows:

- Assignments: Shortened Task and/or Extended Time *As Needed*[2]
- Math: Shortened Assignments and/or Extended Time *As Needed*
- Communication/Listening: Shortened/Concrete Instructions
- Support Services: Learning Lab *Supporting Math Primarily, Working on Basics*
- Testing/Assessment: Other, *Retaking Tests, As Needed* [Id., p. 24]

Between seventh and eighth grade, SLM transferred from Sumner to the North Tapps Middle School ("NTMS") in the Dieringer District. A day or two before eighth grade classes were to begin, Ms. Liedtke took a copy of the Sumner Plan to her meeting with Lis Smoot, a counselor at NTMS. [Dkt. #27-3, p. 3] Dieringer staff were skeptical about the Plan because it failed to disclose what "medical issues" SLM was having and failed to connect those medical issues to SLM's academic accommodations. Nevertheless, Dieringer agreed to follow the Sumner Plan, and Ms. Smoot circulated the Plan to SLM's teachers. During SLM's first two quarters at Dieringer, however, the Plan lay dormant. SLM's attendance was nearly perfect, neither SLM nor his mother requested use of any of the available accommodations, and none of SLM's teachers volunteered them. [Dkt. #13-4, p. 14] Even without concessions from the Plan, SLM did acceptably well during his first quarter at Dieringer, finishing with slightly above a "C" average. [Dkt. #27-3, p. 3] His second quarter did not go nearly as well, and SLM began failing most of his classes. [Id., p. 4]

---

[1] At oral argument, Plaintiff's counsel indicated that SLM's earlier setbacks in school were attributable almost exclusively to his medical-related absences. Indeed, it appears that SLM's 504 Plan "was initiated because SLM was missing school due to a health problem, Genito-Urinary Defect[.]" [Dkt. #27-3, p. 16]

[2] The accommodations portion of the Sumner 504 Plan was created on a pre-printed form by checking boxes. Those parts that were handwritten onto the form have been italicized here.

On December 19, 2004, Ms. Liedtke decided to intervene. [Dkt. #13-3, p. 2] In her first e-mail, sent to Ms. Smoot and all of SLM's teachers, Ms. Liedtke explained that SLM had been hiding his progress reports from her and that the decline in his grades had come as quite a surprise. [Id.] She also expressed her need for a better way to "hold him accountable," although she made no reference to the Plan or to any physical or academic disability. [Id.] Dieringer responded and suggested that SLM be placed on an academic contract, thereby allowing Ms. Liedtke to monitor SLM's homework assignments on a daily basis. NTMS staff also directed Ms. Liedtke to their online "PASS" system, which allows parents to track outstanding homework assignments via the internet. [Id., pp. 2-4] Ms. Liedtke enthusiastically responded to this suggestion,"Yes! Let's put him on the contract," and it was soon implemented. [Id., p. 4] Still, no mention of the 504 Plan was made, and it remained dormant.

From then on, Ms. Liedtke communicated frequently with SLM's teachers via e-mail. She often inquired as to how SLM might raise his grade in a particular course, focusing her inquiries on SLM's missing assignments and looking for ways for him to earn extra credit. The 504 Plan entered the picture on January 12, 2005, when Ms. Liedtke sent e-mails to SLM's math, reading, science, and history teachers, mentioning overdue assignments and including the following boilerplate language at the bottom of each e-mail: "According to the 504 Plan, how much extra time does [SLM] have to get assignments in before he is docked on the grade and how should he go about asking for the extra time?"[3] [Dkt. #13-3, pp. 7-10] None of SLM's teachers responded directly, and no further mention of the Plan was made. SLM's second quarter came to an end in late January 2005, his grades were finalized, and his mother's e-mails came to a halt. [Dkt. #13-3, pp. 15-16] Things were quiet for the next two months.

Meanwhile, Dieringer staff held a meeting to discuss their concerns about SLM's 504 Plan. [Dkt. 13-4, p. 13] This was done because Dieringer staff felt it would be unfair to allow SLM to retake tests when he did not seem to need the extra time, and they removed that provision from the Sumner 504 Plan. [Dkt. #14, pp. 2-3] SLM's parents were not invited to attend, and they received no notice of the meeting. [Dkt. 13-4, p. 13]

---

[3] Ms. Liedtke never asked to have the 504 Plan's concessions applied in a proactive manner; instead, she waited until SLM had missed a deadline (or failed a test), and then asked for extra time (or a re-take). [Dkt. #13-4, p. 13]

Then, on March 14, 2005, Ms. Liedtke received SLM's third-quarter progress report, and the e-mails resumed. [Dkt. #13-3, p. 20] Among other e-mails sent that day was one directed at SLM's grade in science, which had fallen to a "D" by that time: "I would like to know what is the actual grade and if it is what is on the progress report, why the big drop in one week.  If it is test related, I would like him to retake any tests need be.  Please let me know.  Thanks!" [Id., p. 19] SLM's science teacher explained that SLM would have other opportunities to improve his grade, but that she did not offer test retakes. [Id.] Ms. Liedtke's relationship with Dieringer staff began to strain on March 23, 2005, when, after being told by SLM's math teacher that SLM would not be allowed to re-take two tests he had failed, Ms. Liedtke responded: "A couple of questions, do you know what a 504 Plan is?  Do you know that [SLM] is on one? Do you know that he is supposed to be able to have more time if needed to finish assignments WITHOUT his grade being negatively impacted?  Do you know that he is SUPPOSED to be able to retake tests?" [Dkt. #13-3, pp. 37-39] Ms. Liedtke ended this two page e-mail by saying that it might be time to have SLM re-evaluated for an Individualized Education Program ("IEP") under the IDEA. [Id.] Dieringer never replied, and Ms. Liedtke's husband, John, took over communicating with the school a few days later. [Id., p. 44]

With the use of the daily contract, the PASS system, and much intervention on the part of parents and Dieringer staff, SLM managed noticeable improvements in his grades during his third and fourth quarters at NTMS.  Unfortunately, these improvements proved to be too little, too late, and it did not appear that SLM would not accumulate enough points under Dieringer's "Standards of Excellence" program to walk with the rest of his class.  Realizing this, Ms. Liedtke sent an e-mail to all of SLM's teachers shortly before grades were due, noting that SLM was "1/2 a point shy towards graduation" and asking for some last-minute grade improvements. [Dkt. #13-3, p. 81] When that suggestion was not well-received, Ms. Liedtke sent another e-mail describing all of the issues SLM had faced: the departure of his biological father, the multiple surgeries to correct his hypospadias, and his prior bed wetting. [Id., pp. 85-86]

SLM's teachers were sympathetic; but when they did not agree to raise any of SLM's grades, Ms. Liedtke became increasingly hostile. [Id., p. 89-90] On June 16, 2004, it became crystal clear that no exception would be made for SLM and that he would not be allowed to attend the graduation ceremonies. [Id., p. 95] Ms. Liedtke appealed this decision to the Dieringer School Board, but her appeal was denied.

1  [Dkt #13-4, pp. 2-10] SLM was promoted to the ninth grade, but he was not allowed to walk in the

2  ceremonies with the rest of his class. [Id., p. 10]

3      Ms. Liedtke then filed a formal grievance with the U.S. Department of Education, Office for Civil

4  Rights ("OCR").  OCR investigated and found that SLM had not been eligible to participate in the

5  graduation ceremonies and that his failure to satisfy Dieringer's requirements had not been the result of his

6  disability. [Id., pp. 14-15] OCR did find that Dieringer had not complied with all of the procedural

7  requirements of Section 504, but found insufficient evidence of a link between Dieringer's procedural

8  shortcomings and SLM's failure to meet the standards for graduation. [Id., p. 15] By that time, graduation

9  had passed and SLM had left the Dieringer School District.

10      For his freshman year, SLM enrolled at Riverside High School ("Riverside"), in the Auburn School

11  District ("Auburn").  In September 2005, apparently without conducting an evaluation, Auburn renewed

12  SLM's Section 504 eligibility based on his genito-urinary defect. [Dkt. #27-3, p. 13] SLM was enrolled in

13  Auburn's FLIGHT program ("Freshman Learners Improving Goals and Habits Together"), which the

14  school describes as "an innovative program designed to improve academics, develop quality learning and

15  study habits, and [help students] connect with the high school environment and demands." [Id., p. 15]

16      In March 2006, Ms. Liedtke began taking SLM to a private psychologist, who eventually

17  diagnosed SLM with Attention Deficit Hyperactive Disorder ("ADHD"). [Dkt #27-4, p. 2] Then, in April,

18  Ms. Liedtke had SLM's schedule at Riverside cut back to reduce anxiety and stress. [Dkt. #27-3, p. 15]

19  Shortly thereafter, Riverside re-evaluated SLM and found that the original reason for SLM's Section 504

20  eligibility, his genito-urinary defect, was no longer an issue. [Dkt. #27-3, p. 16] However, Riverside

21  *did* conclude that SLM was eligible for "specially designed education in the area of math" under the IDEA.

22  [Id., p. 22] SLM's schedule was cut back even further in June 2006, and SLM ultimately fell behind the

23  rest of his class.  He is currently a junior in high school and is doing well, although he is not expected to

24  graduate with the rest of his high school class.

25      This suit was filed against Dieringer in Pierce County Superior Court on April 11, 2007, and

26  Dieringer then removed the matter to U.S. District Court.  Plaintiff brings claims under Section 504 of the

27  Rehabilitation Act of 1973 and the Washington Law Against Discrimination.  Generally, Plaintiff avers that

28  Dieringer failed to follow his Section 504 accommodation plan, failed to timely evaluate him, and retaliated

against him for exercising his rights.  Plaintiff also avers that this behavior led to his wrongful exclusion from Dieringer's eighth grade graduation ceremonies.

## III. DISCUSSION

### A.      Applicable Anti-Discrimination Law & Terminology

"Section 504" refers to the Rehabilitation Act of 1973 § 504,  29 U.S.C. § 794(a).  Section 504 contains a "broadly-worded prohibition on discrimination" against disabled individuals.  *Mark H. v. Lemahieu*, 513 F.3d 922, 930 (9th Cir. 2008).  Similarly, at the local level, the Washington Law Against Discrimination ("WLAD") prohibits discrimination against disabled persons in places of public accommodation.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).  SLM brings claims under both statutes. [Dkt. #23]

"IDEA" (the Individuals with Disabilities Education Act) has a different purpose: to ensure that learning disabled children receive a free and appropriate public education ("FAPE"), which is designed to meet their unique needs.  20 U.S.C. § 1400(d)(1)(A); *Mark H.*, 513 F.3d at 928.  Thus, while IDEA provides redress for "inappropriate educational placement decisions," Section 504 provides redress for discrimination. *See Janet G. v. Hawaii, Dept. of Educ.*, 410 F.Supp.2d 958, 965 (D.Hi. 2005) (internal quotations omitted).  IDEA provides for injunctive relief, but does not allow for ordinary money damages. *Mark H.*, 513 F.3d at 929.  SLM originally tested ineligible for special education services under IDEA, and no injunctive relief is available to him; thus, no violation of IDEA is alleged in his amended (and operative) complaint. [Dkt. #23]

### B.      Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The moving party has the initial burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *U.S. v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990).  When a properly supported motion for summary judgment is made, the burden then shifts and the opposing party must set forth specific facts showing that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 250.  Put another way, summary judgment should be granted where the non-moving party fails to offer evidence from which a reasonable jury could return a verdict in its

1    favor. *Id.* at 252.  When viewing the evidence at this stage, all justifiable inferences are drawn in favor of

2    the non-moving party. *Id.* at 255.

3    **C.    Section 504**

4              To establish a prima facia claim for discrimination under Section 504, SLM must produce evidence

5    that: (1) he is "disabled" as that term is defined in Section 504; (2) he was "otherwise qualified" for the

6    benefits he was denied; and (3) he was discriminated against solely on the basis of his disability. *Zukle v.*

7    *Regents of the Univ. of California*, 166 F.3d 1041, 1045 (9th Cir.1999).[4]  SLM must also prove intentional

8    discrimination, defined as "deliberate indifference." *Duvall*, 260 F.3d at 1138.  "Deliberate indifference

9    requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act

10   upon that the likelihood." *Id.* at 1139.

11             Because Plaintiff's allegations and Section 504 claims have become somewhat amorphous, each

12   allegation will be addressed in turn, summarized as follows:

13        (1)      Dieringer failed to follow the Sumner 504 Plan and failed to provide appropriate

14                 accommodations for SLM's disability.

15        (2)      Dieringer staff retaliated against SLM when he invoked his rights under Section 504.

16        (3)      Dieringer violated the procedural requirements of Section 504.

17        (4)      Dieringer was deliberately indifferent to SLM's needs.

18             **1.    SLM's Disability &Requested Accommodations**

19   <u>Academic Accommodations</u>

20

21             ───────────────────

              [4] For purposes of the motion for summary judgment, the Court concludes that whether SLM was in
22   fact "disabled" within the meaning of Section 504 during his time at Dieringer is a question for the jury.
     However, the Court notes that there is little evidence, if any, to support this proposition.  Claimants under
23   Section 504 must prove that they have an impairment which "substantially limits" a major life activity.  *See*
     *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002). Major life activities include "caring
24   for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."
     34 C.F.R. § 104.3(j)(2)(ii).  SLM's mother argues that SLM's hypospadias "interfered with his ability to attend
25   school in his early years causing a significant deficit in his ability to learn." [Dkt. #27, p. 15] The Court notes
     that there is no evidence that SLM's hypospadias led to excessive absences during his time at Dieringer; in fact,
26   his attendance was nearly perfect. [See Dkt. #14, p. 4]

27             In response to the motion for summary judgment, SLM attempts to claim his ADHD as an additional
     qualifying disability under Section 504, notwithstanding the fact that he was not diagnosed with the disorder
28   until after he left Dieringer. [Dkt. #27, pp. 14-16] Essentially, SLM implies that he might have been diagnosed
     with ADHD in March 2005 had the staff at NTMS properly evaluated him then.  This argument, however,is
     does not appear to be supported by any competent evidence.

The only accommodations ever requested by SLM's mother were those listed in the Sumner 504 Plan, and those accommodations are purely academic in nature: shortened assignments, extensions of time, and test retakes, all "as needed."  In this regard, Plaintiff claims that Dieringer staff should have allowed SLM to turn in late assignments and retake tests throughout the year and that Dieringer's decision not to do so on some occasions violated Section 504.  In response, Dieringer suggests that test re-takes and penalty-free late assignments were available "as needed" by SLM, not "as requested" by SLM's mother.

Unfortunately for Dieringer, the plain text of the Plan fails to specify if and when the listed accommodations will be provided.  Thus, drawing all reasonable inferences in SLM's favor, the language of the 504 Plan is sufficiently ambiguous to raise an issue of fact for trial.

Physical Accommodations

In response to the motion for summary judgment, Ms. Liedtke asserts that SLM's poor grades in Physical Education ("P.E.") were attributable to his hypospadias condition and the fact that SLM was "leaking urine" in his gym shorts; she implies that Dieringer should have excused SLM from P.E., or at least modified the P.E. curriculum in some way. [Dkt. #27-3, p. 4] Even accepting Ms. Liedtke's story as true, it fails to raise an issue of fact for trial.

This is because Ms. Liedtke *herself* expressed puzzlement at SLM's low grade in P.E. during the time he was enrolled in the course.  On January 3, 2005, Ms. Liedtke wrote to Ms. Smoot, "The F in P.E. is unreal.  He must not be participating at all? [sic] I am really puzzled on that one." [Dkt. #13-3, p. 4] On that same day, Ms. Liedtke explained to SLM's P.E. teacher, Mr. Crossen, that SLM had "ongoing problems with his heels and knees,"[5] but went on to say that SLM was running and working out "6-8 hours per week." [Id., p. 5] Ms. Liedtke never told Mr. Crossen about SLM's hypospadias and never suggested that he was "leaking urine."

Even after Mr. Crossen responded that he was "confused" and concerned that he had been misinformed about SLM's limitation, no mention was made of SLM's hypospadias. [Id.] In fact, it appears that Mr. Crossen was first informed of SLM's condition on June 16, 2005, *after* SLM's P.E. grade had been finalized, *after* it had become clear that SLM's grades did not qualify him for graduation, and *after*

---

[5] Other than this offhanded statement, there is no evidence in the record of SLM having heel or knee problems, and the issue was not mentioned by either party at oral argument.

1    the school board had rejected Ms. Liedtke's appeal of that decision. [Dkt. #13-3, p. 98]

2          Both parties have a duty to engage in an "interactive process" to consider any requested

3    accommodations, and this duty arises upon notification of the disability and the desire for accommodation

4    under Section 504. *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). The process requires

5    "communication and good-faith exploration of possible accommodations[.]" *Humphrey v. Memorial*

6    *Hospitals Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). Neither party can obstruct or delay the interactive

7    process, and any party that does is acting in bad faith. *Id.* "A party that fails to communicate, by way of

8    initiation or response, may also be acting in bad faith." *Id.* (quoting *Beck v. University of Wisconsin Bd. of*

9    *Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)); *see also Allen v. Pacific Bell*, 348 F.3d 1113, 1115 (9th

10   Cir. 2003) (per curiam) (no further duty to engage in "interactive process" under ADA once employee

11   failed to provide additional requested information regarding disability); *Brown v. Lucky Stores, Inc.,* 246

12   F.3d 1182, 1188 (9th Cir. 2001) (employer had no affirmative obligation under ADA to provide

13   accommodation, absent a request).

14         Parents of a disabled student cannot hide the contours of that disability from the student's

15   educators, and then bring suit under Section 504 for failure to accommodate – especially where, as here,

16   the disability is intensely private in nature. *See Allen*, 348 F.3d at 1115-16 (affirming summary judgment

17   for employer where employee failed to cooperate in search for accommodation). Put another way, there is

18   no evidence (and can be no evidence) that Dieringer staff discriminated against SLM based on a disability

19   about which they did not know and about which SLM refused to tell them.[6] *See Zukle*, 166 F.3d at 1045.

20   SLM's claim that Dieringer failed to accommodate him in P.E. fails as a matter of law.

21         **2.      Retaliation**

22         SLM also alleges that Dieringer retaliated against him after he invoked his rights under Section

23   504. He suggests that he was penalized for participating in the "study buddy" program, denied the right to

24   graduate with his class, and disciplined more harshly than his classmates. [Dkt. #27, pp. 22-23] SLM also

25   points to an incident in which one of his teachers told him that he was hated by NTMS staff. [Dkt. #27-3,

26   p. 11]

27

28         [6] Even absent a request, there may be situations in which the duty to accommodate is triggered. *See*
     *Brown*, 246 F.3d at 1188 (explaining exception to general rule). This is not one of them.

1  To succeed on this claim, both parties agree that SLM must prove (1) that he engaged in a

2  protected activity, (2) that Dieringer's actions were "sufficient to deter a person of ordinary firmness from

3  exercising his rights," and (3) there was a causal connection between the protected activity and the

4  retaliatory action. [Dkt. #27, p. 22; Dkt. #12, p. 18] *See Lauren W. ex rel. Jean W. v. Deflaminis*, 480

5  F.3d 259, 267 (3d Cir. 2007). "A defendant may defeat the claim of retaliation by showing that it would

6  have taken the same action even if the plaintiff had not engaged in the protected activity." *Id.* Requesting

7  accommodation is a protected activity, satisfying the first requirement. *See Weixel v. Board of Educ. of*

8  *City of New York*, 287 F.3d 138, 149 (2d Cir. 2002).

9  It appears that SLM received only two disciplinary referrals during his time at NTMS. [Dkt. #18,

10  pp. 23-23] One of these referrals was issued on October 26, 2004, before SLM's mother began requesting

11  accommodations under the Plan. [Id., p. 23] The other was issued later in the year by SLM's bus driver,

12  but there is no evidence that the bus driver knew of SLM's protected activity. [Id., p. 24] Thus, no

13  reasonable juror could find those referrals to be retaliatory. *See Lauren W.*, 480 F.3d at 267.

14  With regard to SLM's exclusion from graduation, Dieringer has met its burden of showing that it

15  would have taken the same action even if SLM had not engaged in protected activity: Dieringer applied the

16  Standards of Excellence to all students at NTMS [Dkt. #14, p. 2], and the district's failure to make an

17  exception for SLM does not support a claim for retaliation. *See Weixel*, 287 F.3d at 149.

18  However, SLM points to two incidents that may create issues of fact for the jury. First, Ms.

19  Liedtke claims that SLM was penalized for participating in the "study buddies" program, citing an e-mail

20  from SLM's math teacher. [See Dkt. 13-3, p. 35] While a reasonable juror could conclude that SLM was

21  actually docked for taking his homework to "study buddies" *and then turning it in late*, a jury might also

22  find that SLM was penalized simply for participating in the program. Whether such a penalty would be

23  sufficient to "deter a person of ordinary firmness from exercising his rights," *See Deflaminis*, 480 F.3d at

24  267, is also a question of fact for the jury. Second, while Ms. Liedtke's own account of the incident

25  suggests that SLM's language arts teacher made his comment in response to SLM's own incivility [Dkt.

26  #27-3, p. 11], a reasonable jury might find otherwise.

27  **3.    Procedural Violations**

28  While the OCR investigation found no evidence of discrimination, the agency *did* find that

1    Dieringer had violated some of the procedural requirements of Section 504; specifically, OCR concluded

2    that Dieringer should have responded to Ms. Liedtke's March 23, 2005, request that SLM be evaluated for

3    IDEA purposes. [Dkt. #13-4, p. 14] OCR also concluded that Dieringer had erred by simply distributing

4    the Sumner 504 Plan despite their concerns about its legitimacy, waiting until January 2005 to modify the

5    Plan, and failing to notify SLM's parents of that modification. [Id.]

6            Whether SLM can obtain damages for these violations, however, depends on whether the

7    regulations in question fall within the implied right of action for damages under Section 504.  *Mark H.*, 513

8    F.3d at 935.  That, in turn, depends on whether those regulations "authoritatively construe" the statute

9    itself.  *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001);  *Mark H.*, 513 F.3d at 935.  Thus, where a

10   regulation forbids conduct that the text of the statute permits, a private plaintiff cannot bring suit based on

11   a violation of that regulation.  *Sandoval*, 532 U.S. at 285-86;  *Mark H.*, 513 F.3d at 935 (Section 504

12   regulations are privately enforceable only to the extent "their requirements fall within the scope of the

13   prohibition contained in [Section] 504 itself.").

14           The Court reserves the question of whether the particular regulations in question here

15   "authoritatively construe" Section 504.  This appears to be an issue of first impression in the Ninth Circuit,

16   and resolution of that issue is immaterial to the pending motion for summary judgment.  In any event, the

17   Court concludes that SLM has raised an issue of fact as to whether Dieringer's procedural violations, in

18   aggregate, constitute "deliberate indifference."

19       **4.      Deliberate Indifference**

20           To satisfy the "deliberate indifference" requirement, SLM must prove (1) that Dieringer knew its

21   behavior was "substantially likely" to harm one of SLM's federally protected rights and (2) that Dieringer

22   failed to act upon that the likelihood**.**  *See Duvall*, 260 F.3d at 1139.

23           The record shows that NTMS staff worked hand-in-hand with both SLM and his parents in an

24   attempt to make SLM successful.  In response to Ms. Liedtke's initial request for "a better way to hold

25   [SLM] accountable" [Dkt. #13-3, p. 2], NTMS staff suggested (and Ms. Liedtke agreed) that a "daily

26   contract" should be implemented. [Id., pp. 2-4] However, there are several instances in the record where

27   Dieringer seems to have ignored requests for accommodation under Section 504.  Drawing all reasonable

28   inferences in SLM's favor, these instances, in aggregate, might lead a reasonable jury to conclude that

1    Dieringer's conduct was "deliberately indifferent."

2    **D.      Washington Law Against Discrimination**

3    discrimination." *See Fell v. Spokane Transit Authority*, 128 Wn.2d 618, 637, 911 P.2d 1319 (1996).

4          A cause of action under the WLAD differs from one under Section 504 only in that it the WLAD

5    requires no showing of intentional discrimination. *Duvall*, 260 F.3d at 1135 n. 10.  Thus, because SLM's

6    claims under Section 504 have survived summary judgment, his WLAD claims necessarily survive as well.

7    *See id*.

8                                         **IV. CONCLUSION**

9          SLM has raised issues of fact for trial regarding Dieringer's failure to comply with the procedural

10   and substantive requirements of Section 504.  A jury might even find that Dieringer retaliated against SLM.

11   Defendant Dieringer's motion for summary judgment [Dkt. #12] is therefore DENIED.[7]

12         DATED this 7th day of May, 2008.

13

14   _____

15   RONALD B. LEIGHTON
     UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26   _____

27        [7] The Court is reminded of Circuit Judge Nelson's admonition in *Yartzoff v. Thomas*, 809 F.2d 1371,
     1377-78 (9th Cir. 1987).  This Court's conclusion that summary adjudication is unavailable should not
28   embolden SLM or lead him to believe that he will ultimately succeed at trial.  Dieringer has produced
     substantial evidence of the efforts it made to help SLM succeed, and the fact that SLM has located some
     evidence that *might* allow a jury to find otherwise doesn't means that a jury *will* find otherwise.

ORDER
Page - 12